UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| Gladys Yarboro Barnette Lloyd, | ) |
| | ) |
|     *Plaintiff*, | ) |
| | ) |
| v. | )   No.: 3:12-CV-210-PLR-HBG |
| | ) |
| Federal Insurance Company, *et al.*, | ) |
| | ) |
|     *Defendants*. | ) |

**Memorandum Opinion**

After her son died, Federal Insurance Company denied Gladys Lloyd's claim for accidental death benefits because they believe Ms. Lloyd's son William Sallee Jr.'s death was caused in whole or in part by his underlying medical conditions—a loss not covered by the policy. Ms. Lloyd argues instead that Mr. Sallee died of a multiple drug interaction or overdose, which she contends is covered by the accidental death policy. She has filed this action under 29 U.S.C. § 1132(a)(1)(B) seeking review of the denial. Presently before the Court are the parties' cross-motions for judgment on the pleadings. [R. 42, 44]. The Court has carefully reviewed the parties' pleadings and the administrative record in light of the controlling law. Because Federal's denial of Ms. Lloyd's claim was not arbitrary and capricious, the defendants' motion for judgment on the pleadings will be granted. Ms. Lloyd's motion will be denied.

**I. Standard of Review**

The parties agree that the appropriate standard of review is the arbitrary and capricious standard—not the *de novo* standard. The arbitrary and capricious standard is the least

demanding form of judicial review of administrative action. When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious. *Killian v. Healthsource Provident Admn. Inc.,* 152 F.3d 514, 520 (6th Cir. 1998). Under this standard, the court will uphold the administrator's decision, "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence. The administrator's decision must be rational in light of the plan's provisions." *Helfman,* 573 F.3d at 392.

The court must accept a plan administrator's rational interpretation of the plan, "even in the face of an equally rational interpretation offered by the participants." *Gismondi v. United Technologies Corp.,* 408 F.3d 295, 298 (6th Cir. 2005), *quoting Morgan v. SKF USA Inc.,* 385 F.3d 989, 992 (6th Cir. 2004). The court's review is limited to the record before the Appeals Committee at the time it made its decision. *Wilkins v. Baptist Healthcare Sys. Inc.,* 150 F.3d 609, 616 (6th Cir. 1998).

While the arbitrary and capricious standard of review is highly deferential, it is not "without some teeth;" the deference must not be abject. *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003). The courts are not to "rubber stamp" a plan administrator's decision, but must "review the quantity and quality of the medical evidence on each side." *Schwalm v. Guardian Life Ins. Co.*, 626 F.3d 299, 308 (6th Cir. 2010) (citing *Evans v. UnumProvident Corp.*, 434 F.3d 866, 875 (6th Cir. 2006)).

Finally, courts should be aware of conflicts of interest and "consider it as a factor in determining whether the decision to deny benefits was arbitrary and capricious." *Gismondi*, 408 F.3d at 298. "[T]here is an actual, readily apparent conflict, not a mere potential for one, when the company or plan administrator is the insurer that ultimately pays the benefits." *Id.* at 299

2

(internal punctuation and citation omitted). In this case, such a conflict is undisputed, and will be considered in deciding if the denial of benefits was arbitrary or capricious.

## II. Background

William Edgar Sallee Jr. was a 50-year old engineer who worked for the Fluor Corporation. [AR 218]. Mr. Sallee was morbidly obese; he stood 6'3" and weighed 326 pounds. [AR. 1620]. Mr. Sallee also suffered from severe high blood pressure, a "massively enlarged heart," back pain, dental problems, and possibly sleep apnea. [AR. 1874-77]. In May 2009, Mr. Sallee had an extensive amount of dental work done for which he was prescribed oxycodone. *Id.* He was also prescribed alprazolam (Xanex) and promethazine. *Id.*

On May 19, 2009, when Mr. Sallee failed to arrive at work, his employer sent the police to his residence to check on him. [AR. 1619]. They found Mr. Sallee dead in his apartment sitting in his recliner with the television on. [AR. 1618]. His body was in an advanced state of decomposition. [AR. 373]. There was no evidence of external trauma. [AR. 374]. Dr. Stephen Pustilnik, of the Galveston County, Texas Medical Examiner's Office performed an autopsy the following day and determined the cause of death was "multiple drug intoxication." [AR. 373].

At the time of his death, Mr. Sallee had a $1,000,000 accidental death policy. Ms. Lloyd was the beneficiary under the policy, and she filed a claim with the defendants in August of 2009. [AR. 134]. Federal first investigated whether Mr. Sallee's death was the result of "drug abuse," as was noted on the death certificate. Federal's investigator spoke with the detective who was present for the autopsy as well as the medical examiner's staff and determined that Mr. Sallee was not "abusing" his medications as the phrase is commonly understood. [AR. 1422-26].

Federal then referred the claim to Dr. Brent Morgan for a review of the medical evidence. [AR. 878-79]. Dr. Morgan reviewed Dr. Pustilnik's report and found a conversion error. Dr.

3

Pustilnik's report noted that the concentration of alprazolam in the tested sample was 0.36 mg/L when the correct value was 0.036 mg/L—one tenth the amount noted by the report. Dr. Morgan explained that the levels of alprazolam, oxycodone, and promethazine were not "extremely elevated," and were consistent with someone taking the medications as prescribed; however, Dr. Morgan noted that there was a possibility of post mortem redistribution—where after death blood taken from the heart can contain higher concentrations of drugs than blood taken from elsewhere. *Id.* Accordingly, one must be careful comparing these samples (if they were taken from the heart) to other post mortem studies involving blood taken from peripheral blood vessels or samples taken from live patients.

Dr. Morgan explained that the drugs in Mr. Sallee's system could "have an additive effect of compromising the respiratory drive." A patient with a history of coronary artery disease and a previous myocardial infarction "could be more susceptible to a cardiac arrhythmia secondary to low oxygen blood concentration brought about by drug induced respiratory depression." Finally, Mr. Sallee was morbidly obese, and it is possible he may have had sleep apnea, which made him "potentially more susceptible to respirator compromise from narcotics." *Id.*

Federal referred the claim to a second physician—Dr. Paul Hoyer—who concluded that "[t]he cause of death is uncertain although a heart attack is most likely. It is possible but not likely that he died from the combined effects of his medications." [AR. 1543]. Dr. Hoyer noted Mr. Sallee received a physical examination on April 29, 2009 where he "documented severe high blood pressure" and was advised to go to the emergency room. *Id.* At the emergency room, a chest x-ray showed an enlarged heart, but Mr. Sallee's blood pressure substantially decreased while he was there so they sent him home. *Id.*

4

According to Dr. Hoyer, the autopsy notes indicate a stent in Mr. Sallee's right coronary artery, a massively enlarged heart, and a myocardial scar from an old heart attack. Mr. Sallee's heart weighed 680 grams while the expected heart weight for a man the same height as Mr. Sallee is about 340 grams. Dr. Hoyer opined that there are three possible mechanisms of death for Mr. Sallee: obstructive sleep apnea; respiratory arrest due to drug overdose; and acute myocardial infarction (a heart attack). Obstructive sleep apnea cannot be diagnosed after death without solid history, and Mr. Sallee had no history of sleep apnea. Dr. Hoyer explained that due to advanced decomposition, testing the levels of the drugs in Mr. Sallee's decompositional fluid cannot provide meaningful results other than the knowledge that the drugs were present in his system. The amount of drugs taken, the in life blood level of drugs, and the degree of intoxication is "unknown and unknowable." [AR. 1544]. However, "[r]espiratory arrest due to combined drug intoxication is not believable. Proof would require evidence of a massive acute overdose of narcotic. Such evidence is not present; it would require more narcotics and hypnotics than were prescribed." [AR. 1546]. Dr. Hoyer concluded that Mr. Sallee likely died of a heart attack due to "morbid obesity, significant atherosclerotic coronary artery disease, previous heart attack, massively enlarged heart, and severe high blood pressure." *Id.*

Shortly after receiving Dr. Hoyer's opinion, Federal denied Ms. Lloyd's claim. [AR. 1552]. Mr. Sallee's policy states: "We will pay the applicable Benefit Amount . . . if an Accident results in a covered Loss not otherwise excluded." [AR. 1554]. The policy defines an accident as a sudden, unforeseen, and unexpected event which happens by chance; arises from a source external to an insured person; is independent of illness, disease or other bodily malfunction or medical or surgical treatment thereof; occurs while the insured person is insured under the policy which is in force; and is the direct cause of loss. The policy also contains a

5

"Disease or Illness" exclusion that excludes coverage for losses "caused by or resulting from an Insured Person's emotional trauma, mental or physical illness, disease, pregnancy, childbirth or miscarriage, bacterial or viral infection, or bodily malfunctions." *Id.* Federal informed Ms. Lloyd that, based on their review of the information received, "it was confirmed that Mr. Sallee suffered from cardiomegaly; morbid obesity; high blood pressure; atherosclerotic cardiovascular disease; and a remote heart attack." [AR. 1556]. Federal concluded that it was unable to provide coverage for the loss because:

> It has been confirmed that Mr. Sallee's death was not the result of an Accident, and it [was] not shown that his death was independent of disease, illness or other cause, which is subject to the Policy's Disease or Illness exclusion, which excludes coverage for bodily malfunction in addition to excluding Loss caused by physical illness or disease.

*Id.*

Ms. Lloyd appealed Federal's decision. She supported the appeal with a letter from Dr. Pustilnik. Dr. Pustilnik's letter notes that he reviewed Dr. Hoyer's opinion, and he explained that "[p]ost-mortem redistribution is a well known phenomenon in forensic toxicology, but that is only a significant consideration when testing blood from the right side of the heart or near the liver." [AR. 1612]. In Mr. Sallee's case, decompositional fluid was tested, which is not as susceptible to post-mortem redistribution. *Id.* Dr. Pustilnik's letter concludes that Mr. Sallee had a toxic quantity and combination of drugs in his system when he died, and he implies that heart disease was not the cause of death because Mr. Sallee had severe heart disease the week and month prior to his death but had not died yet. *Id.* Dr. Pustilnik did not address the conversion error noted by Dr. Hoyer.

Ms. Lloyd also supported her appeal with an opinion provided by Dr. Cyril Wecht, an independent expert retained by Ms. Lloyd. [AR. 1618-23]. After a thorough review of Mr.

6

Sallee's medical history and the medical reports written by Dr. Morgan and Dr. Hoyer, Dr. Wecht concluded that, "[w]hile Mr. Sallee had cardiomegaly and apparent myocardial ischemia, his death was most likely due to the respiratory depression produced by the increased levels of multiple respiratory depressants." [AR. 1622]. The combination of oxycodone, promethazine, and alprazolam found in Mr. Sallee's system "would have caused respiratory depression in a cardiac compromised individual. These drugs let to a pathophysiological situation in which an already compromised heart was required to work even harder." *Id.*

Furthermore, Dr. Wecht opined that "the effect of respiratory-depressant drugs in a patient with sleep apnea could predispose that individual to sudden death. At Mr. Sallee's emergency room visit barely 11 days prior to his death, he was advised to undergo a sleep study when he reported apnea." *Id.* Dr. Wecht concluded, based upon a reasonable degree of medical certainty, that Mr. Sallee's death "was caused by respiratory depression due to inadvertent combined drug effect in a patient with hypertensive and atherosclerotic heart disease. . . . If these multiple drugs had not been ingested at or around the same time, Mr. Sallee would not have died on or about Friday, May 15, 2009." [AR. 1623].

Federal thereafter referred Mr. Sallee's case to yet another reviewer—Dr. Michael Baden, the former Chief Medical Examiner for the City of New York. Dr. Baden reviewed the autopsy report, toxicology reports, death certificates, Fort Bend County Texas Sheriff's report, the drug prescription information sheet, Dr. Jayshree Adenwala's office records, the dentist's records, Advanced Pain Care's reports, St. Michael's Emergency Center's records, and the expert reports prepared by Doctors Morgan, Hoyer, and Wecht. [AR. 2424].

Dr. Baden concluded that the cause of death attributed to Mr. Sallee by the coroner (Dr. Pustilnik) was incorrect; Mr. Sallee did not die of the drugs properly present in his body. All of

7

the drug concentrations in Mr. Sallee's body were "well below lethal levels." Mr. Sallee's heart was twice normal size, "indicating that he had suffered from severe long-standing hypertensive cardiovascular disease." Moreover, "[h]is lungs together weighed 1550 grams, three times normal because of fluid backup typical for congestive heart failure." Dr. Baden opined that "the medical history, the circumstances of death and the autopsy and toxicology findings clearly establish that Mr. Sallee's death was due to long-standing natural hypertensive and arteriosclerotic heart disease with terminal congestive heart failure as his lungs filed with pulmonary edema fluid." [AR. 2425].

Shortly after receiving Dr. Baden's report, Federal's appeals committee issued a final denial of Ms. Lloyd's claim. [AR. 1917-19]. Federal explained that the drugs in Mr. Sallee's system were not at lethal levels. They did not cause his death; Mr. Sallee's medical condition of hypertension and arteriosclerotic heart disease caused it. The appeals committee's denial was Federal's final denial. Accordingly, Ms. Lloyd filed her challenge before this Court.

### III. Discussion

Federal denied Ms. Lloyd's claim on two related grounds: *first*, Mr. Sallee's death was not an "accident" as defined by the policy; and *second*, the policy's disease or illness exclusion bars coverage for Mr. Sallee's death.

The parties agree that Ms. Lloyd bears the burden of proving an "accident" occurred as defined by the policy, which provides that an "accident" must be a sudden, unforeseen, and unexpected event that:

1. happens by chance
2. arises from a source external to an Insured Person;
3. is independent of illness, disease or other bodily malfunction or medical or surgical treatment thereof;
4. occurs while the Insured Person is insured under this policy which is in force; and
5. is the direct cause of loss

8

[AR. 86]. There is no dispute that Mr. Sallee's death was sudden, unforeseen, or unexpected and that it meets four of the five enumerated requirements. The only dispute is whether the "accident" was independent of illness, disease, or other bodily malfunction.

Ms. Lloyd contends there is a distinction between an "accident" and a "loss" under the policy. According to Mrs. Lloyd, the "accident" in this case was not Mr. Sallee's death—it was the drug interaction or overdose that led to the "loss"—Mr. Sallee's death. The policy insures against "accidents" that lead to "losses." Because "accident" and "loss" are different things, Ms. Lloyd's theory that Mr. Sallee suffered from an "accident" in the form of a sudden, unforeseen drug interaction, independent of illness or disease, would neatly fit within the policy's definition of "accident."

While the Court is inclined to agree that the "accident" and "loss" are distinguishable events, even under the facts of this case, it need not hold on the matter because Ms. Lloyd's case could still not survive the disease or illness exclusion.[1] The disease or illness exclusion provides as follows:

> This insurance does not apply to any Accident, Accidental Bodily Injury or Loss caused by or resulting from, directly or indirectly, an Insured Person's emotional trauma, mental or physical illness, disease, pregnancy, childbirth or miscarriage, bacterial or viral infection, bodily malfunctions or medical or surgical treatment thereof.

[AR. 84]. With this exclusion, it does not matter whether Mr. Sallee's "accident" and "loss" can be distinguished from each other because there is more than sufficient evidence for Federal to find that Mr. Sallee's death—the "loss"—was caused by or resulted at least indirectly from his underlying diseases.

---

[1] For the plaintiff to meet her burden of proving that an "accident" occurred, not only must she successfully argue that the "accident" is the drug interaction and the "loss" Mr. Sallee's death, but she must demonstrate that Federal's review of the evidence and conclusion that the drugs in Mr. Sallee's system were not at lethal levels and that there was no drug interaction or overdose was arbitrary and capricious.

Ms. Lloyd contends that applicable law should limit the effect of the broad disease or illness exclusion. Applied literally, she argues, "there would be almost no death which was covered under this or any other typical Accidental Death Policy, rendering such policies misleading at best, and entirely illusory at worst." [R. 46, p. 7]. In some situations, Courts have tempered policy language to bring the policy's application in conformity with the reasonable expectations of the insured. *See, e.g. Wickman v. Northwestern Nat'l Insurance Company*, 908 F.2d 1077 (1st Cir. 1990); *Goetz v. Greater Georgia Life Insurance Company*, 649 F. Supp. 2d 802 (E.D. Tenn. 2009). Ms. Lloyd contends the policy should be read so as to require Mr. Sallee's underlying disease or illness have more than a *de minimus* or undefined role in the loss.

Ms. Lloyd's contention that the disease or illness exclusion, taken literally, would render accidental death policies illusory is not persuasive. There are limitless examples of accidents that would be covered by the policy, including car accidents, falls, or even "drug interactions" that would have killed a healthy person. Accordingly, this Court sees no reason to temper the language of the policy. The proper inquiry then, is whether Mr. Sallee's death was caused by or contributed to (even partially) by his disease. Would he have died from the alleged drug interaction absent his heart disease, blood pressure, etc.?

Other Courts facing substantially similar situations have held similarly. In *Cooper v. Unum Life Ins. Co. of America*, 2010 WL 5859544 (E.D. Tenn. Nov. 16, 2010),[2] the court considered a claim for accidental death benefits that was denied because the death "was caused by an illness, such that coverage for the loss was excluded under the policy terms." The Court explained:

---

[2] Report and Recommendation adopted by 2011 WL 703935 (E.D. Tenn. Feb. 7, 2011).

> When a policy insuring against accidental death contains exclusionary language substantially to the effect that benefits are precluded where death directly or indirectly results from or is contributed to by disease, the inquiry is properly limited to determining if the accident alone was sufficient to cause death directly and independently of disease; an exclusionary clause therefore precludes recovery where death results from a pre-existing disease or from a combination of accident and pre-existing disease.

*Id.* at *10.

Under the arbitrary and capricious standard, the Court will uphold the administrator's decision, "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Helfman* 573 F.3d at 392. "The administrator's decision must be rational in light of the plan's provisions." *Id*. Moreover, the Court must accept a plan administrator's rational interpretation of the plan, "even in the face of an equally rational interpretation offered by the participants." *Gismondi v. United Technologies Corp.,* 408 F.3d at 298.

In this case, numerous doctors, including the plaintiff's own retained expert, opined that Mr. Sallee's death was at least partially the result of his own illness or disease,[3] and only one doctor (who thought the level of alprazolam was ten times higher than it actually was) appears to believe Mr. Sallee was killed solely from a drug interaction or overdose. Accordingly, Federal's attribution of Mr. Sallee's death to his underlying illness is supported by substantial evidence.[4] Even if there was an "accident" in the form of a drug interaction or overdose arising independently of Mr. Sallee's health conditions, the resulting "loss" was not similarly independent. Federal's conclusion that the record does not support the assertion that Mr. Sallee

---

[3] Dr. Wecht's opinion stated that the drugs in Mr. Sallee's system "would have caused respiratory depression *in a cardiac compromised individual.* These drugs led to a pathophysiological situation in which *an already compromised heart* was required to work even harder." (emphasis added)

[4] In fact, even if the Court were to accept the plaintiff's argument that Mr. Sallee's illness must have played a "substantial" role in his death for the disease or illness exclusion to apply, there is enough evidence in the record to support such a conclusion.

11

would have died from the combination of drugs in his system absent his underlying conditions is a rational interpretation of the evidence.

As an alternative to her argument that the illness or disease exclusion should be tempered, Ms. Lloyd argues that, because the policy's narcotics exclusion contains a specific exception allowing claims for death due to prescription drugs, Mr. Sallee's claim cannot be denied under the more general "disease or illness" exclusion. This argument is also unavailing. As mentioned above, if the evidence showed that Mr. Sallee would have died solely from the prescription drug interaction (i.e. he would have died even if he did not have any underlying illnesses or diseases), Mr. Sallee's death would have triggered coverage. The prescription drug exception does not convert every death involving prescription drugs into a covered loss.

Finally, the Court notes that there is an actual conflict of interest in this case because Federal not only decides whether or not Ms. Lloyd is entitled to receive benefits, but Federal is also responsible for paying her $1,000,000 if she is found entitled. Nevertheless, the substantial weight of the evidence supports Federal's conclusion that the policy's disease or illness exclusion applies. The evidence does not support the assertion that Federal's conflict prevented it from reaching the correct result.

## IV. Conclusion

For the foregoing reasons, plaintiff Gladys Lloyd's motion for judgment on the pleadings [R. 42] is **DENIED;** defendants Federal Insurance Company and Fluor Employee Benefit Trust Plan's motion for judgment on the pleadings [R. 44] is **GRANTED;** Federal's decision in this case denying Ms. Lloyd's application for accidental death benefits is **AFFRIMED;** and this case is **DISMISSED.**

_____
UNITED STATES DISTRICT JUDGE